# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In re:

STANISLAV O. ILYEV,                                    Case No. 17-12987-KHK
Debtor.                                                Chapter 13

**MEMORANDUM OPINION AND ORDER OVERRULLING IN PART AND SUSTAINING IN PART SVETLANA KHARLAMOVA'S OBJECTIONS TO CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN FILED ON AUGUST 28, 2018**

This matter came before the Court on November 8, 2018, for a hearing on the objections of Svetlana Kharlamova to the Debtor's amended chapter 13 plan. (Docket Number 103). For the reasons stated below, the objections are overruled in part and sustained in part.

### Findings of Fact

The Court, having heard the evidence, makes the following findings of fact:

Stanislav Ilyev, the Debtor, lives in Sterling, Virginia along with his current wife, their two children and his mother. He has worked for the same law firm in its IT department for 7 years, and has been a licensed real estate agent for 12 years. (Transcript of Evidentiary Hearing at 15-18, Case No. 17-12987).

The Debtor was formerly married to Tsvetelina Ilyev (Ms. Ilyev). They separated and entered into a Marital Settlement Agreement ("MSA") on August 7, 2008. Ex. 1 ("Marital Settlement Agreement"). It provided that they would divide the marital property equally at a later date. The marriage ended in divorce in May 2010. On October 1, 2015, the Debtor and Ms. Ilyev signed the Amendment to their MSA. Ex. 2 ("2015 Amended MSA"). The amendment provided that Mr. Ilyev would convey his interest in their jointly held real property located at

1

45595 Iron Horse Terrace, Sterling, Virginia ("Iron Horse") and 2040 Royal Fern Court, #22A, Reston, Virginia ("Royal Fern") to Ms. Ilyev for the sum of $35,000. A major factor in determining the amount of the consideration was that Ms. Ilyev made all mortgage payments and paid all of the taxes on both properties for seven years prior to the transfer. *Id.*; Tr. at 21.

Mr. Ilyev was also formerly married to Svetlana Kharlamova, a creditor in this case. Ms. Kharlamova and the Debtor entered into a Property Settlement Agreement ("PSA") on September 1, 2015. Ex. 3 ("2015 PSA"). It provided that Ms. Kharlamova would transfer her interest in the marital residence located at 45476 Baggett Terrace, Sterling, Virginia to the Debtor in exchange for $52,000. *Id*. at 14. Prior to filing this case, Mr. Ilyev paid $35,000 of that obligation to Ms. Kharlamova. The remaining balance shall be paid through this bankruptcy as a non-priority unsecured claim. Tr. at 36-38; *See also* Proof of Claim 10-1 filed on behalf of Svetlana Kharlamova).

Prior to the entry of the divorce decree, Ms. Kharlamova wanted to be relieved of responsibility for the mortgage lien on the property, but Mr. Ilyev did not qualify to refinance the property in his name alone. Rather than selling the property at a loss, John Hus, an associate of the Debtor, agreed to be a co-signer with Mr. Ilyev on the loan to refinance in exchange for an ownership interest in the property. To consummate the agreement, Mr. Ilyev and Ms. Kharlamova signed a Deed transferring a one-half interest in the property to Mr. Hus on April 3, 2015. Tr. at 34-35 and Tr. at 67; *See also* Ex. O ("Deed of Gift").

Mr. Ilyev's Schedule D discloses mortgage liens on the Iron Horse and the Royal Fern properties in addition to his current residence and Wells Fargo Bank, N.A. ("Wells Fargo") has filed proofs of claims for the three obligations in this case. According to his Schedules and the proofs of claims, the Baggett Terrace property was valued at $350,000 and was encumbered by a

2

lien with a balance due of $250,927 on the petition date.  The Iron Horse property was valued at

$340,000 and was encumbered by a lien with a balance due of $258,109.  The Royal Fern

property was valued at $180,000 and was encumbered by a lien with a balance due of $134,499

on the petition date.  Tr. at 33:4-17; *See also* Proofs of Claim Numbers 3-1, 4-1 and 6-1.

According to the Schedule I attached to his plan, the Debtor's total monthly income of

$5,425 is derived from $5,741 in gross wages, $1,500 from real estate commissions and a $500

contribution from his mother who resides with him.  Mr. Ilyev made $39,477 in real estate

commissions in 2016, $14,557 in 2017, and has received $14,000 in commissions in 2018.  His

mother now contributes $600 to the monthly household expenses. Tr. at 18 and Tr. at 52-53.

The Debtor's Schedule J attached to the plan indicates monthly expenses of $4,995.  It

includes a $600 expense for the support of a dependent not living with the Debtor; however, the

notation on Line 19 of Schedule J indicates this expense recently ended.  When this case was

filed, the daughter Mr. Ilyev shares with Ms. Kharlamova, was attending day care and he was

responsible for paying a portion of her daycare expenses.  This obligation ceased when his

daughter began attending public school in September 2018.  Mr. Ilyev is still under a Court

Order to pay one-half of his daughter's medical expenses and up to $300 per month for extra-

curricular activities. Tr. at 43-44.  *See also* Proof of Claim 11-1 filed on behalf of Svetlana

Kharlamova at 32.[1]

Mr. Ilyev filed his petition on September 2017.  The current plan was filed on August 28,

2018, and is the third plan proposed by the Debtor.  It provides for payments totaling $25,440

over 60 months.  This amount is sufficient to pay Wells Fargo for pre-petition mortgage arrears

and the chapter 13 trustee's fee.  The balance of the funds will be paid to Mr. Ilyev's unsecured

---

[1] Exhibit 3 attached to Proof of Claim 11-1 is an email from Counsel for Ms. Kharlamova to Counsel for Mr. Ilyev which summarizes the Debtor's child support obligations from October 2016 until August 2017.  It states Mr. Ilyev's monthly expense was "$740+" per month.  Of that amount $440 was for school/child care expenses.

creditors that have filed claims in this case.  After deducting Ms. Kharlamova's priority claim

allowed in the amount of $10,947 and the priority claim filed by the Internal Revenue Service for

$3,220, the balance of the unsecured non-priority allowed claims is $74,036.

Ms. Kharlamova filed an objection to the current plan on October 4, 2018.

### Conclusions of Law

The Bankruptcy Code provides that a court may not confirm a plan unless it "provides

that all of the Debtor's projected disposable income to be received in the applicable commitment

period beginning on the date that the first payment is due under the plan will be applied to make

payments to unsecured creditors under the plan."  11 U.S.C. § 1325(b)(1)(B).

Ms. Kharlamova contends that this plan violates the disposable income test because the

Debtor fails to commit all of his disposable income to the plan. At the hearing, Mr. Ilyev testified

that the wages and deductions reflected on his Schedule J were derived by using a paystub he

received shortly before this plan was filed. Ex. 12 ("Direct Deposit Advice dated July 27,

2018"). Ms. Kharlamova argues that Mr. Ilyev's gross monthly income should be increased to

include a raise he received in October 2018.  The Court acknowledges that the phrase

"projected" in §1325(b)(1)(B) requires courts to consider at confirmation the Debtor's actual

income; however, it does not concede that it must include as disposable income, a raise the

Debtor began receiving 1 year after the "applicable commitment period" began in September

2017 and two months after the current plan was filed.  The Court is not willing to burden a

chapter 13 trustee with the task of tracking the raises of all debtors during the life of a plan.

Moreover, in this case, the raise is not substantial and is merely designed to cover a wager

earner's increased cost of living.  The Court finds that Mr. Ilyev's estimation of his projected

monthly income from wages as stated on Schedule J is appropriate.

Ms. Kharlamova also argues that Mr. Ilyev's gross monthly income should be increased

to include overtime wages commiserate with the amounts of overtime he received in 2017.  The

Debtor's Schedule I does not include any overtime pay.  At the hearing, the Debtor explained

that although he received nearly $2,500 in overtime pay in 2017 and $510 in early 2018, his

overtime "has been cut to a minimum." Tr. at 50-51.  Based on the Debtor's testimony that his

employer has reduced overtime hours, the Court will not attribute overtime pay to his gross

income that he may not receive over the life of the plan.

In her objection, Ms. Kharlamova alleges that Mr. Ilyev deposited $42,308 into his bank

account in 2017 in addition to his wage income.  At the hearing, Mr. Ilyev, under cross-

examination admitted he did not remember the source of each deposit made in 2017, but he gave

satisfactory explanations for the deposits he was questioned about.  He explained that many of

the deposits represented money he borrowed from friends or associates to tide him over until he

received his next commission check, and that he did not consider these funds as income because

the money had to be paid back.  Moreover, he provided explanations for all extra deposits for

2018. Tr. at 53-59; Ex. D ("2007 Deposit Records for Account 0736"); Ex. V ("2018 Deposit

Records for Account 0736").

With regards to the Debtor's expenses, Ms. Kharlamova contends in her objection that

his estimated monthly expenses differ materially from the expenses shown on his bank

statements. For example, she contends that the Debtor actually spent on average $137 per month

less on utilities, food and household expenses than the amounts listed on his Schedule J.

Unfortunately, the pleading does not indicate which bank statements were used or the time

period Ms. Kharlamova reviewed to come up with her estimations and these expenses were not

discussed at the hearing.  Without more evidence, the Court will not assume that the projected

monthly averages propounded by Ms. Kharlamova are more accurate than the amounts assigned by the Debtor on his Schedule J.

The objection also states the Debtor's vehicle insurance was paid by someone else, but fails to indicate the source of the payment.  This issue was not addressed at the hearing, so the Court cannot determine whether the same source will be able to continue paying the premium for the duration of the plan.  Since this is a legitimate and required obligation belonging solely to Mr. Ilyev, the Court will not require that his proposed monthly expenses be reduced by the amount of his vehicle insurance premium.

After considering the Debtor's testimony, the Court finds his average monthly commission income of $1,500 is appropriate and that his mother's monthly contribution to the household expenses is understated by $100.  Thus, his projected monthly income is increased to $5,525.

The Debtor's current projected monthly expenses of $4,995 include an expense for child support in the amount of $600, however, a more precise account of those expenses may be found in the supporting documents to Proof of Claim 11-1 filed on behalf of Ms. Kharlamova. According to her calculations, when this case was filed, Mr. Ilyev's monthly support obligation was $740, including $440 for childcare and $300 for extra-curricular activities plus 50% of any medical expenses incurred.  It appears that the current Schedule J understates Mr. Ilyev's actual support obligation by at least $140 per month, but still includes a $440 childcare expense he no longer has.  When his budget is adjusted to account for the changes, his projected monthly expenses are $4,695 which results in a monthly disposable income of $830.

The Bankruptcy Code provides that the court shall confirm a plan if "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed

unsecured claim is not less than the amount that would be paid on such claim if the estate of the

Debtor were liquidated under chapter 7 of this title on such date."  11 U.S.C. § 1325(a)(4).  This

section of the Code is referred to the liquidation test.

When this case was filed, the Debtor listed the value of the Baggett Terrace property as

$350,000.  Mr. Ilyev is an experienced realtor and is familiar with comparable sales in his

neighborhood, so the Court accepts this value; however, one year later the property has

appreciated in value and the Debtor does not disagree.  Prior to the hearing, each party paid to

have the property appraised. The appraisals varied slightly so the parties agreed to stipulate that

the value of the property as of the effective date of the plan is $385,000.

The Debtor argued at the hearing that regardless of the current market value, the property

value to use for purposes of the liquidation test is $350,000 and the Court ruled from the bench

that the value of the property as of the petition date would be used in the liquidation analysis;

however, that ruling must be vacated.  After a more thorough examination of § 1325(a)(4), it is

clear that the plain language of the Section states that the value of the property *at the time of*

*liquidation* is the appropriate value.  If a chapter 7 trustee sold the property today, the value to

the estate would be the net proceeds of a sale at today's price.  It stands to reason that the

liquidation test, if applied today would require the use of the current market price; therefore, the

property must be valued at $385,000 for purposes of the liquidation test.

The current plan proposes to pay unsecured creditors a 4% dividend and estimates that if

a hypothetical chapter 7 trustee were to liquidate the Debtor's assets, these creditors would

receive a dividend of 0%.  Ms. Kharlamova contends this plan cannot be confirmed because

unsecured creditors would receive more than 4% in a chapter 7 case if the property were sold

now.  Her contention is based in part on the assumption that, with the exception of the $17,000

that represents her equity in the Baggett Terrace property, all of the net proceeds of a sale should be attributed to the Debtor.  Ms. Kharlamova admits that Mr. Hus is now a title owner of the property, but she contends he has no right to a share of the net proceeds of a sale because he has made no financial contribution toward the purchase of the home.  The Court is not persuaded by this argument.  At the hearing, Mr. Ilyev testified that Ms. Kharlamova agreed to transfer an interest in the property to Mr. Hus as an inducement to get him to co-sign along with Mr. Illyev on a loan to refinance the mortgage.  The refinance allowed Ms. Kharlamova to be relieved of any financial responsibility for the debt. Tr. at. 34-35. Now that Mr. Hus has replaced Ms. Kharlamova as a co-signer on the mortgage lien that encumbers the property, he assumes responsibility for any deficiency on the debt if the property goes into foreclosure.  Having received the benefit of the bargain, Ms. Kharlamova now has no standing to challenge Mr. Hus' interest in the property.  The Court finds therefore that if a hypothetical chapter 7 trustee sold the property, Mr. Ilyev's estate would ultimately have to share the net proceeds equally with Mr. Hus.

After deducting for the cost of sale, the mortgage, a hypothetical chapter 7 trustee's commission, Ms. Kharlamova's equity, Mr. Hus' equity and the Debtor's homestead exemption, this Court finds the net proceeds of sale available for unsecured creditors in a chapter 7 case would be $22,935.  This would result in a 31% dividend to unsecured non-priority creditors in this case.  The calculations are:

| | |
|---|---|
| $385,000 | Value property on effective date of plan |
| -250,928 | Mortgage |
| 134,072 | Net Sale Proceeds |
| - 23,100 | 6% Sales Commission |

| | |
|---|---|
| - 17,000 | Ms. Kharlamova's Equity |
| 93,972 | Total Net Equity |
| - 46,986 | Mr. Hus' Equity |
| 46,986 | Estate's Total Equity |
| - 5,000 | Debtor's HD Exemption |
| 41,986 | Estate's Net Equity |
| 3,000 | Trustee Administrative Expenses[2] |
| - 19,051 | Trustee Commission[3] |
| ***$19,935*** | ***Estate Equity for Unsecured Creditors*** |

Finally, Ms. Kharlamova contends that Mr. Ilyev's petition was not filed in good faith

and therefore his plan cannot be confirmed and his chapter 13 case should be dismissed or

converted to a case under chapter 7 of the Bankruptcy Code.  The Code provides that the Court

shall confirm a plan if "the action of the Debtor in filing the petition was in good faith." 11

U.S.C. § 1325(a)(7).  In determining whether a chapter 13 petition was filed in bad faith, the

Fourth Circuit follows the factors discussed in *In re Love*, 957 F.2d 1350 (7th Cir.1992).  *See*

*also In re Kestell*, 99 F.3d 146, 148 (4th Cir. 1996).  The test for bad faith looks to the totality of

the circumstances and contains both objective and subjective components. *Id.*  The underlying

inquiry is based on fundamental fairness. The non-exhaustive list of the factors includes: the

nature of the debt; whether the debt would be non-dischargeable in a chapter 7 proceeding; the

timing of the petition; how the debt arose; the Debtor's motive in filing the petition; how the

---

[2] The estate would normally incur additional expenses for the Trustee's attorneys and accountant fees.

[3] The hypothetical trustee's commission in this case is calculated on $316,014.  This figure represents the sale price minus the funds distributed to Ms. Kharlamova, Mr. Hus and to the Debtor for his $5,000 homestead exemption. Pursuant to 11 U.S.C. § 326, a chapter 7 trustee's maximum allowed commission is calculated as follows:  25% on the first $5,000 or less, 10% on amounts between $5,000 and $50,000, 5% on amounts between $50,000 up to $1,000,000 and reasonable compensation not to exceed 3% on amounts greater than $1,000,000.  11 U.S.C. § 326(a).

Debtor's actions affected creditors; the Debtor's treatment of creditors before and after the petition was filed; and whether the Debtor has been forthcoming with the bankruptcy court and the creditors. *Id.* The burden of demonstrating bad faith is on the moving party. *In re Love*, 957 F.2d at 1355.

Ms. Kharlamova argues that the Debtor has demonstrated that his petition was not filed in good faith because he transferred to Tsvetelina Ilyev his interest in the Royal Fern and Iron Horse properties in order to alienate his equity in those properties from the estate. Although she carries the burden of proving bad faith, she presented no evidence to support this position. On the other hand, on the eve of the hearing, the Debtor filed a response to the Ms. Kharlamova's objection that addresses the transfers and concludes that the sale of the properties would not provide a benefit to unsecured creditors even if they were sold by a chapter 7 trustee. (Docket Number 118). As previously stated, the transfers were made for consideration, so it is doubtful that a hypothetical chapter 7 trustee, after accounting for the costs of litigation, would seek to overturn either transfer. Moreover, based on the Debtor's testimony and the proofs of claim filed by Wells Fargo, the Court concurs that a sale of the properties today would not yield net proceeds that would be available for unsecured creditors. Therefore, the Court is not persuaded that the Debtor's conduct in transferring the properties demonstrates bad faith or creates a detriment to unsecured creditors.

Ms. Kharlamova also contends that the petition was filed in bad faith because the Debtor has not been able to propose a feasible plan in over a year. While this is true, the Court does not attribute any undue delay to the Debtor. Other than making a routine request to extend the time to file his original schedules and plan, the Debtor has appeared at every hearing and has demonstrated by his conduct a sincere desire to reorganize his finances. The trustee's objections

to previous plans were addressed in a timely manner and the objections by the Debtor to claims

in the case have been resolved in his favor.

Although he was combative at the first confirmation hearing conducted a year ago, Mr.

Ilyev's demeanor since then has markedly improved and is consistent with that of an honest

Debtor.  At the latest confirmation hearing, he was responsive, cooperative and consistent under

direct and cross-examination showing no signs of evasiveness.  In short, he was a credible

witness.  After considering the totality of the circumstances surrounding the filing of this petition

including the factors discussed in the *Love* case, the Court concludes that this case passes the

objective and subjective tests for a good faith filing.

Accordingly, it is **ORDERED** that

1. The objection to the petition on grounds of lack of good faith is **OVERRULED**; and

2. The objection to confirmation of the current plan is **SUSTAINED** and confirmation is

   **DENIED** with leave to propose an amended plan that provides for payments:

   a. of at least $830 per month from January 2019; and

   b. that results in the payment of at least $19,935 to unsecured non-priority creditors.

Date: _Dec 10 2018_____

/s/ Klinette Kindred
_____
Klinette H. Kindred
United States Bankruptcy Judge
Entered on Docket: December 11, 2018

Electronic copies to:

Thomas Gorman
Robert Brandt
Fenlene Edrington